**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Casimir STASZCUK, Defendant-Appellant.**

**No. 73-1869.**

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1974.

Decided Sept. 10, 1974.

Rehearing En Banc Granted Dec. 23, 1974.

Sherman C. Magidson, Warren D. Wolfson, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and SPRECHER, Circuit Judges, and CAMPBELL,* Senior District Judge.

SPRECHER, Circuit Judge.

In 1967 defendant was elected alderman from the 13th ward in the City of Chicago. According to the evidence viewed in a light most favorable to the government, defendant accepted three payments of $3,000 each from a "zoning consultant," Al C. Allen. Allen testified he made the payments on behalf of his clients in return for defendant's agreement not to oppose their applications for zoning amendments relating to three pieces of property in the 13th ward.

Defendant was convicted by a jury on three counts of Hobbs Act violations,[1] four counts of mail fraud,[2] and two counts of filing false income tax returns.[3] He was sentenced to nine concurrent sentences of eighteen months each.

## I. Hobbs Act Counts

The indictment charged defendant with obstructing, delaying and affecting commerce "by means of extortion," in that he "obtained property not due either him or his office . . . with [Allen's] consent being induced under color of official right." The indictment specified that Allen feared he would be unable to procure the zoning changes "unless he compensated defendant to refrain from objecting to such . . . change[s] as a member of the Chicago City Council. . . ."

Apparently this is one of the first prosecutions under section 1951 to rely solely on subsection b(2)'s definition of extortion as "the obtaining of property from another, with his consent, induced . . . under color of official right."[4] All reported Hobbs Act cases charging extortion relied on the "wrongful use of actual or threatened force, violence, or fear" section of the definition. The only exception is United States v. Kenny, 462 F.2d 1205 (3d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. 18 U.S.C. § 1951(a): "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so . . . shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

2. 18 U.S.C. § 1341: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

3. 26 U.S.C. § 7206(1).

4. Another such case is pending on appeal in this court. United States v. Braasch, Nos. 74-1000-1017 and 74-1105.

176 (1972), in which defendants were charged with extortion through wrongful use of fear *or* under color of official right.

Defendant concedes, as we believe he must,[5] that under the Hobbs Act "color of official right" may replace the coercion of "force, violence, or fear."

Defendant argues, rather, that his acceptance of three $3,000 payments for not opposing the zoning changes was not under color of official right because it was not related to his official functions. An alderman need not oppose or favor a particular zoning application, and defendant offered some evidence that the City Council does not always act consistent with an alderman's position on a zoning change in his ward. His only authorities for this proposition are People v. Samuels, 188 Misc. 607, 71 N.Y.S.2d 562 (1947), and Collier v. State, 55 Ala. 125 (1876). In *Samuels* a tax collector was charged with extortion for accepting a fee to "straighten out" a claim which he had no power to settle, compromise or influence. The court held that the statute covered only situations where the service provided by the official was within the scope of his public employment. In *Collier* a county attorney accepted fees for giving professional advice as a private attorney. The court held he may have accepted money under .false pretenses, but since the fees did not relate to his official function he had not committed extortion.

■ The government presented sufficient evidence of an alderman's in-fluence[6] over zoning applications in his own ward that the jury could conclude defendant's official functions encompassed the unbiased consideration and treatment of all zoning applications. The payments were made to defendant to influence his exercise of the political power he held as alderman over zoning applications. To accept money in return for an agreement not to oppose such applications—in effect to suspend independent judgment on the merits of such zoning changes—constitutes obtaining property from another, with his consent, induced under color of official right. The evidence supports defendant's convictions for extortion.

■ Conviction under the Hobbs Act, however, requires proof that the extortion had at least an arguably *de minimus* effect on interstate commerce. United States v. DeMet, 486 F.2d 816 (7th Cir. 1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). To satisfy this jurisdictional element of the crime, the government presented evidence that on the rezoned properties in counts I and II were built apartment buildings that could not have been constructed under the previous zoning. Certain materials used in the construction of these buildings were shipped in interstate commerce. Because the rezoning, procured through extortion, created a demand for construction materials to be shipped into Illinois, the effect on interstate commerce[7] in counts I and II was direct and demonstrable.[8]

5. *See* United States v. Kenny, 462 F.2d 1205, 1229 (3d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972), in which the court approved submission of the case to the jury under instructions allowing conviction for extortion through fear or under color of official right. *See also* Chief Judge Swygert's concurrence in United States v. DeMet, 486 F.2d 816, 822–823 (7th Cir. 1973), cert. denied. 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) ; United States v. Sutter, 160 F.2d 754, 756 (7th Cir. 1947) ; and Stern, Prosecution of Local Political Corruption under the Hobbs Act, 3 Seton Hall L.Rev. 1 (Fall 1971), written by the prosecutor of the *Kenny* case.

6. And of Allen's impression of an alderman's influence. *Cf*. United States v. Varlack, 225 F.2d 665 (2d Cir. 1955).

7. There are no cases definitively holding that the effect on commerce either must be or need not be an adverse effect. But surely the word "affects" in the phrase "obstructs, delays, or affects" is superfluous if it is interpreted to mean "affects adversely."

8. United States v. Pranno, 385 F.2d 387 (7th Cir. 1967), cert. denied, 390 U.S. 944, 88 S. Ct. 1028, 19 L.Ed.2d 1132 and 972, 88 S.Ct. 1094, 19 L.Ed.2d 1183 (1968) ; United States v. Kramer, 355 F.2d 891 (7th Cir. 1966) ; Anderson v. United States, 262 F.2d

The property in count III had to be rezoned to permit construction of an animal hospital. Once the zoning change was made, however, the veterinarian for whom the hospital was to be built backed out of the deal. The owner instead erected buildings which were proper under the previous zoning. To show the rezoning's effect on interstate commerce under count III, the government presented the testimony of one of three potential contractors, who said his company would have used materials from interstate commerce if it had been awarded the contract to construct the animal hospital.

The government cites several cases for the proposition that any *potential* effect on commerce satisfies the Hobbs Act. In United States v. Pranno, 385 F.2d 387 (7th Cir. 1967), cert. denied, 390 U. S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 and 390 U.S. 972, 88 S.Ct. 1094, 19 L.Ed. 2d 1183 (1968), there was no delay in construction because the extortion money was paid and the building permit issued. The court upheld the Hobbs Act convictions because "it was only necessary to prove that delay would have been caused had the owner and contractor refused payment and defendants carried out their threat to withhold the permit." 385 F.2d at 390. But here the result of the extortion payment was exactly the same as if no extortion or rezoning had occurred: no shipment of materials in interstate commerce.

The court in United States v. Hyde, 448 F.2d 815, 836 (5th Cir. 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30

L.Ed.2d 745 (1972), made the point that there is no requirement "the company be engaged in an interstate transaction at the moment of the extortion to support federal jurisdiction." But the victim companies did participate in interstate activities within a year of the payoffs which permitted them to stay in business.

The victim in United States v. Tropiano, 418 F.2d 1069 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970), purchased trucks from an out-of-state corporation. By surrendering his right to solicit additional customers in response to extortionate threats by a competitor, the victim "automatically limited his future orders" for the trucks.[9] The owner of the count III property, however, was not engaged in interstate commerce at the time of the extortion; the rezoning did not promote any future interstate activities because he never built the animal hospital.

 We agree that the effect of the extortion on commerce does not have to be simultaneous with the extortion. Indeed, it followed the extortion by some months in counts I and II. But when the effect never materializes—despite the failure or success of the extortion— the commerce element of the Hobbs Act is not established.[10] *Cf.* United States v. Critchley, 353 F.2d 358 (3d Cir. 1965).

The convictions on counts I and II are affirmed; the conviction on count III is reversed.

---

764 (8th Cir.), cert. denied, 360 U.S. 929, 79 S.Ct. 1446, 3 L.Ed.2d 1543 (1959); Hulahan v. United States, 214 F.2d 441 (8th Cir.), cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954).

Since the extortion directly facilitated the flow of building materials in interstate commerce, we need not depend on a "depletion of assets" theory to show an effect on commerce. Thus we need not decide whether Allen or his clients were the victims of the extortion, or whose assets were depleted.

9. United States v. Augello, 451 F.2d 1167 (2d Cir. 1971), cert. denied, 405 U.S. 1070,

92 S.Ct. 1518, 31 L.Ed.2d 802 (1972), is a similar case.

10. The government argues we must accept any potential effect of extortion as satisfying the Hobbs Act, or eliminate the offense of attempted extortion under section 1951, since the only effect of an attempt must be a potential effect. This is a frivolous argument, since the government can prove what the result of an extortion attempt would have been if the extortion had been successful. If the extortion is successful and there is still no effect on commerce, the extortioner has not violated the Hobbs Act.

## II. *Mail Fraud Counts*

Applications for zoning changes are introduced before the City Council and referred to the Committee on Buildings and Zoning. The committee sets a date for a public hearing and sends form notices to occupants of buildings within 150 feet of the subject property.[11] Four such notices are the mailings charged in the four mail fraud counts. Defendant argues that the committee's mailing of these notices was not in furtherance of his scheme to defraud.

■■ We begin with the proposition that "statutes such as section 1341 should be carefully and strictly construed in order to avoid extension beyond the limits intended by Congress." United States v. Kelem, 416 F.2d 346, 347 (9th Cir. 1969), cert. denied, 397 U. S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970). To support federal criminal jurisdiction, the mailing must be, in the words of the statute, "for the purpose of executing such scheme or artifice." The connection between the fraud and the use of the mails "must be real and proximate, not merely abstract or remote." United States v. Brickey, 296 F.Supp. 742, 748 (E.D.Ark.1969).

The requisite connection was established in Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), where the victim used the mails to procure the cash she turned over to defendants. A letter or inquiry in response to a newspaper advertisement satisfied the statutory requirement in United States v. Hopkins, 357 F.2d 14 (6th Cir.), cert. denied, 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966). And the mailing of an I.R.S. interest-payment notice to legitimize a fictitious loan was considered integral to the pretense in United States v. Isaacs, 493 F. 2d 1124, 1151 (7th Cir.), cert. denied,

417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974).

■ But a use of the mails that is not a step toward receipt of the fruits of the scheme is not covered by section 1341. United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); Henderson v. United States, 425 F.2d 134 (5th Cir. 1970); Richardson v. United States, 150 F.2d 58 (6th Cir. 1945). In *Maze* the Supreme Court held a perpetrator of a classic credit-card swindle could not be prosecuted under section 1341. The delay in transmitting invoices was caused by distance rather than by the mail service itself. Since the defendant would have preferred that the invoices never be mailed, the mailings could hardly be said to further his scheme.

■ With these precedents in mind, let us examine the role of the committee's notices of public hearings in defendant's scheme. The purpose of the notices was to provide an opportunity for affected persons to state objections to the proposed zoning changes. Yet Allen's testimony and the timing of the payments after committee approval was assured, imply that the zoning amendments had to go through before defendant would be paid. As in *Maze*, the purpose of the mailings conflicted with, rather than promoted, defendant's scheme to defraud.

In actual fact, the notices had little effect on the procedure of passing the amendments. They produced no witnesses at the Schaefer and Prokop-Zabrodski hearings.[12] one witness at the Harris hearing had received a notice. Two other witnesses identified themselves as adjacent owners, but their ad-

---

11. It is not clear from the record whether the committee is required by law to send these notices or does so as a courtesy to affected persons.

12. There was one witness at the Schaefer hearing who was not on the notice list but who asked for an opportunity to talk with area residents before the committee passed on the amendment. He said that, based on what he had learned at the hearing, "I don't believe we would have any objection. . . ." (Gvn't Ex. 1–6.)

dresses were not on the notice list. All three objected to the zoning change.[13]

From either a theoretical or a factual point of view, the committee's mailing of notices seems too remote from defendant's scheme to support a conviction under section 1341.

The government has three theories to truncate the remote connection between the mailings and defendant's scheme. The first is that the mailings would not have occurred if defendant had not agreed to support the amendments. This "but for" argument may show defendant "caused" the mailings, but is irrelevant to the purpose of the mailings.

The second theory is that the mailings contained misrepresentations. *See* United States v. Smothers, 435 F.2d 209 (7th Cir. 1970), cert. denied, 403 U.S. 906, 91 S.Ct. 2208, 29 L.Ed.2d 681 (1971); United States v. Williams, 424 F.2d 344 (5th Cir 1970). These cases involved false bills of lading and fraudulent and misleading corporate reports. The government says the "latent" misrepresentation in the public-hearing notices is the impression that the committee will objectively consider the recipient's objections, when in fact the payoff to defendant has made the public hearing a sham.

Because the notices contained no false information as such, they are not in the same category as the mailings in *Smothers* and *Williams*. They are much more like the mailings in Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.E.2d 1277 (1960), and United States v. Brickey, 296 F.Supp. 742 (E.D.Ark. 1969), In *Parr*, school trustees mailed legitimate tax bills and receipts with the intention of misappropriating part of the collections. The Supreme Court held the mailings did not contain misrepresentations. In *Brickey* the mailings were routine letters among an insurance company, its independent agencies and its insureds. The government argued that,

by allowing company routine to continue, its president was committing fraud because he knew the company was about to become insolvent through his own looting. The court held the mailings were not fraudulent in themselves, were not misrepresentations of solvency under the circumstances and could not support a prosecution under section 1341.

The government's third theory is that the public-hearing notices "lulled" nearby residents, the most direct victims, into believing their due process rights were being respected when actually they had been subverted by defendant's scheme. The only cases that have accepted "lulling" letters to support mail-fraud convictions have been instances of reassurances that were integral parts of the schemes in allowing the perpetrators to continue profitable relationships with their victims. United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); United States v. Goldberg, 401 F.2d 644 (2d Cir. 1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969). Where, as here, the mailings are not used to conceal and continue a fraud, the "lulling" theory has been rejected. United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); Henderson v. United States, 425 F.2d 134 (5th Cir. 1970).

We conclude that section 1341 does not encompass defendant's scheme to defraud because the mailings were not made in furtherance of that scheme. The convictions on counts IV, V, VI and VII must be reversed.

### III. *Voir Dire*

Defendant claims the district court erred in refusing to ask several questions of prospective jurors. These questions were proposed by defendant not to establish grounds for challenges for cause, but to provide guidance in the exercise of peremptory challenges.

---

13. These witnesses and the attorney representing Harris all believed Harris wanted a zoning amendment to operate a pillow facto- ry, while the record shows Harris, Allen and defendant knew the amendment was necessary for construction of an animal hospital.

The first question was whether any of the panel had previously served on a jury. The district judge has the necessary discretion to decide whether to ask this question. United States v. Ruggiero, 472 F.2d 599 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L. Ed.2d 398 (1973).

The second group of questions requested by defendant was designed to elicit more information about the prospective jurors' personal, social and associational backgrounds than the district judge's questions produced. After reading the transcript of the voir dire, we are satisfied that the background information obtained by the judge and by additional questioning by defendant reached the "happy mesne point" that provided "some basis for a reasonably knowledgeable exercise of the right to challenge." United States v. Lewin, 467 F.2d 1132, 1137 (7th Cir. 1972). We do not approve the judge's refusal to ask male jurors about their marital status and their spouse's occupations while asking female jurors the same questions, but such refusal does not rise to the level of reversible error.

The next refused question was whether the prospective juror or his family member or close friend had ever applied for a job with the federal government. Defendant's argument is that an unsuccessful application would prejudice the venireperson against public officials in general. We do not accept this theory and believe the proposed question was irrelevant to the case.

The final unasked question was whether the prospective juror had ever taken a position with respect to any zoning change. The judge had already asked the panel whether they. had ever tried to change the zoning on property they owned and had explained the nature of the charges against defendant. There is no requirement that a matter "be explored in numerous substantially similar questions, with tedious repetitions, of only slightly variant shadings of meaning." United States v. Lewin, 467 F.2d 1132, 1138 (7th Cir. 1972). The panel was adequately alerted to this possible area of prejudice.

Lewin and United States v. Dellinger, 472 F.2d 340 (7th Cir. 1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L. Ed.2d 706 (1973), are two recent cases from this circuit finding error in the restriction of questioning on voir dire. In *Lewin* the two main witnesses were employees of the Better Government Association and the *Chicago Daily News*. The panel should have been asked whether they contributed to the BGA or were employed by either organization. In *Dellinger* the court refused to inquire into three areas in which conventional jurors were likely to be prejudiced against the unconventional defendants. Neither case provides a parallel for the thorough, detailed voir dire in the present case.

We wish to note our concurrence in Judge CAMPBELL'S concurring opinion.

The convictions on counts I, II, VIII and IX are affirmed.[14] The convictions on counts III, IV, V, VI and VII are reversed.

WILLIAM J. CAMPBELL, Senior District Judge (concurring).

I concur fully in Judge SPRECHER's excellent opinion, and wish only to briefly state my own views with respect to defendant's contention that his actions constituted no more than the acceptance of a bribe, and that his conduct was therefore not extortionate in character. The government need not demonstrate that a defendant, charged with extortion under color of official right, has obtained the property of another through the use of force, duress, fear or the threat of same. The evidence need only demonstrate that the public official has obtained from the "victim" something of value to which the official is not entitled, in return for something that should

---

14. Counts VIII and IX, for filing false income tax returns, were not challenged on appeal except under the voir dire argument.

have been provided without payment. The office held by the official provides the coercive impetus which generates the payment.

In the instant case, the alderman's duties included the objective and unbiased evaluation of applications for zoning variances. Staszcuk was paid money by virtue of his office as alderman so that the powers of that office would not be misused to the detriment of the payor, or at a minimum, to insure that the zoning application would receive the fair and unbiased consideration which it should have been afforded without the encouragement of additional compensation. Thus, the office provided the duress which rendered the acceptance of money by Staszcuk extortion under color of official right.

That is not to say, however, that, as the government contends in the instant case, there is no distinction between the acceptance of a bribe by a public official and extortion under color of official right. For example, assume that a public official has been paid a sum of money to induce him to use his position and influence to obtain a building permit on behalf of an applicant who is clearly not entitled under the law to such a permit. In such a case, the money which the public official receives is not being paid to prevent the coercive use of his office, but rather to assist the payor in his efforts to obtain something to which he is not lawfully entitled. As the court stated in United States v. Pranno, 385 F.2d 387, 390 (7th Cir. 1967) "it might be solely a bribe and not extortion if the record showed that the issuance of the permit was illegal . . .".

Finally, contrary to the defendant's contention in the instant case, bribery and extortion are not necessarily mutually exclusive offenses. *Pranno, supra* at 390. A single payment may be made for more than one purpose, particularly where there exists some question regarding whether the payor is legally entitled to that for which he tenders payment. Where such is the case, the government need only prove the extortionate element of the transaction to support a charge of extortion under color of official right.